**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


ANTWON ROGERS, et al          )
           Plaintiffs          )          C.A. No. 08-149 Erie
                           )
      v.          )          District Judge McLaughlin
                           )          Magistrate Judge Baxter
UNITED STATES OF AMERICA, et al.,  )
           Defendants.          )


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

_____

## I.      RECOMMENDATION

It is respectfully recommended that the motion to dismiss or, alternatively, for summary judgment filed by Defendants [Document # 52] be:

> - granted as to the *Bivens* and RFRA/RLUIPA claims of all Plaintiffs regarding prayer oils due to their failure to exhaust in accord with the PLRA;

> - granted as to all the *Bivens* and RFRA/RLUIPA claims relating to the Eid meal in January of 2006 by Plaintiff Campbell as he has failed to exhaust in accord with the PLRA;

> - granted as to the RLUIPA claims of all Plaintiffs;

> - granted as to the RFRA claims of all Plaintiffs;

> - denied as to the *respondeat superior* argument as to Defendants Sherman and Robare;

> - denied as to the First Amendment free exercise claim;

> - denied as to the Fifth Amendment equal protection claim;

> - granted as to the substantive due process claim under the Fifth Amendment;

> - granted as to the procedural due process claim under the Fifth Amendment;

> - denied as to the qualified immunity defense of all individual Defendants;

- granted as to the dismissal of the FTCA claims against the individual Defendants; and

- granted as to the FTCA claim against the United States.


It is further recommended that the Clerk of Courts be directed to terminated Plaintiff Campbell from this action due to his failure to exhaust his *Bivens* and RLUIPA/ RFRA claims and because the FTCA claims are without merit.

It is further recommended that the Clerk of Courts should also be directed to terminate the United States of America as a party to this action.

The retaliation claims of Plaintiffs Singh and Rogers remain pending as Defendants have not moved for summary judgment on those claims.

A Case Management Order will be issued separately.


## II.      REPORT

### A.      Relevant Procedural History

On May 15, 2008, Plaintiffs Antwon Rogers, Andre Campbell and Desmond Singh, Sunni Muslims incarcerated at the Federal Correctional Institution at McKean ("FCI-McKean"), filed this *pro se* civil rights action.   Plaintiffs allege statutory, constitutional and tort claims related to the alleged denial of Halal meat in celebration of Eid-ul-Adha in January 2006. Plaintiffs also challenge the prison's policy of selling scented oils used in Muslim prayer services through the Commissary, rather than through the special purchase order program.  The three Plaintiffs assert statutory claims under the Federal Tort Claims Act, the Religious Land Use and Institutionalized Persons Act, and the Religious Freedom Restoration Act, as well as *Bivens*[1] claims under the First and Fifth Amendments.  Plaintiffs Rogers and Singh also raise a

---

[1]  See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971) (recognizing a private cause of action to recover damages against federal officers for violations of constitutional rights.).

retaliation claim.  As relief, Plaintiffs seek monetary damages.

Named as Defendants are:  the United States of America; Edward Roberts, the Federal Bureau of Prison's Northeast Regional Religious Service Administrator; James Sherman, former Warden of FCI McKean; S.L. Robare, Assistant Warden at FCI McKean; Jan C. Olowin, former Supervisory Chaplain at FCI McKean; Brian Grimm, Chaplain at FCI McKean; Gerald Desio, Food Service Supervisor at FCI-McKean; and Michael Baldensperger, Trust Fund Supervisor at FCI McKean.

Defendants have filed a motion to dismiss or, in the alternative, motion for summary judgment.  Document # 52.  Plaintiffs have filed a brief in opposition.  Document # 56.  This matter is now ripe for consideration by this Court.

### B.    Relevant Factual History [2]

According to the Amended Complaint, in early October of 2005, Plaintiffs and other Sunni Muslim inmates at FCI McKean ("Sunni inmates") submitted an Inmate Request to Defendant Grimm requesting that Halal lamb be served at their Eid-ul-Adha ("Eid") celebration in January 2006.  Document # 41, Amended Complaint, page 13.  Defendants acknowledge that Eid-ul-Adha commemorates the sacrifice of Ibrahim and is one of two "required" holy days per year for practitioners of Islam.  Document # 53-7, Declaration of Defendant Jan Olowin, Chaplain, page 6.

---

[2]    Plaintiffs Singh and Rogers, along with several other Sunni Muslim inmates, filed nearly identical claims in a previous lawsuit involving the January 2005 Eid celebration. That case was dismissed on February 23, 2009.  See Ellis, et al v. United States of America, et al, Civil Action No. 06-305Erie.

Additionally, Keith Ellis filed a lawsuit with claims identical to those raised in the present action involving the January 2006 Eid-ul-Adha celebration.  Named as Defendants to that action are: United States of America, Edward Roberts, James Sherman, S.L. Robare, Jan Olowin, Brian Grimm, Gerald Desio, Michael Baldensperger, Tina Gee, Gary Buck, and Monica Recktenwald.  That case remains pending as it has survived a motion for summary judgment. See Ellis v. United States of America, et al, Civil Action No. 08-160E.

Plaintiffs submitted a second request to Defendants Grimm and Olowin, dated November 10, 2005, requesting to have Halal beef, rather than Halal lamb, served at the Eid celebration, since the beef was available on the Institutional and/or Certified Menu.  Document # 41, page 3.  The next day, Plaintiffs and others met with Defendants Olowin and Grimm, at which time the Defendants allegedly agreed to have Halal beef served at the Eid celebration, and further agreed to ensure that all participating inmates were on the Religious Diet Program for the day of the Eid-ul-Adha observance.  Id. at 14.

On November 18, 2005, Plaintiffs again met with Defendants Olowin and Grimm to discuss the January 2006 Eid observance, at which time Defendant Olowin allegedly informed Plaintiffs that Halal beef was approved for the ceremonial meal.  Id.  Further, Defendant Olowin allegedly told the group that the Halal beef had already been "purchased and provided for by the food service budget."  Id.  However, on January 10, 2006, the day the Eid observance was scheduled to be held, Plaintiff alleges that "the Defendants refused to provide an appropriate religious dietary meal (Halal beef...) as promised and attempted to coerce and force Plaintiffs and others into rescheduling the Eid and into accepting a non-Halal meal."  Id.

In April 2006, Defendants Olowin and Grimm agreed that "the Religious Service would purchase and provide Prayer oil to the Muslims like Defendants do for other Faith groups concerning their religious items."  Id. at 16-17.  However, the Religious Service stopped purchasing and providing the prayer oil after only two months, and Muslims were not allowed to use the Special Purpose Order (SPO) program to purchase the prayer oil.  Id.

Plaintiffs Rogers and Singh claim that all these acts were done in retaliation against them based upon their involvement as litigants in Civil Action 06-305E.  Id.  See also Document # 56, Opposition Brief, page 14.

### C.      Standards of Review

#### 1.      *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards

than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520-521 (1972).  If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991).  Under our liberal pleading rules, during the initial stages of litigation, a district court should construe all allegations in a complaint in favor of the complainant.  Gibbs v. Roman, 116 F.3d 83 (3d Cir. 1997).  See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same).  Because Plaintiff is a *pro se* litigant, this Court will consider facts and make inferences where it is appropriate.

### 2.      Motion to dismiss pursuant to 12(b)(6)

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true.  Erickson v. Pardus, 551 U.S. 89, 95 (2007).  A complaint must be dismissed pursuant to Rule 12 (b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)(rejecting the traditional 12 (b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41 (1957)).  See also Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S.Ct. 1937 (May 18, 2009) (specifically applying Twombly analysis beyond the context of the Sherman Act).

The Court need not accept inferences drawn by plaintiff if they are unsupported by the facts as set forth in the complaint.  See California Pub. Employee Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) citing Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  Nor must the court accept legal conclusions set forth as factual allegations.

5

Twombly, 550 U.S. at 556, citing Papasan v. Allain, 478 U.S. 265, 286 (1986). See also McTernan v. City of York, Pennsylvania, 577 F.3d 521, 531 (3d Cir. Aug. 245, 2009) quoting Iqbal, ___ U.S. at ___, 129 S.Ct. At 1949 ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). A plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556. Although the United States Supreme Court does "not require heightened fact pleading of specifics, [the Court does require] enough facts to state a claim to relief that is plausible on its face." Id. at 570.

In other words, at the motion to dismiss stage, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." Smith v. Sullivan, 2008 WL 482469, at *1 (D.Del. February 22, 2008) quoting Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). "This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Phillips, 515 F.3d at 232, quoting Twombly, 550 U.S. at 556 n.3.

Recently, the Third Circuit expounded on the *Twombly/Iqbal/Phillips* line of cases:

> To prevent dismissal, all civil complaints must now set out sufficient factual matter to show that the claim is facially plausible. This then allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct.
>
> * * *
>
> After *Iqbal*, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. **First, the factual and legal elements of a claim should be separated. The district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. In other words, a complaint must do more than allege the plaintiff's entitlement to relief.** A complaint has to show such an entitlement with its facts. As the Supreme Court instructed in *Iqbal*, where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief. This plausibility requirement will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

Fowler v. UPMC Shadyside, 578 F.3d. 203, 210-11(3d Cir. 2009).

6

**3.     Motion for summary judgment**

Federal Rule of Civil Procedure 56(c)(2)  provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact.  See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Company, 126 F.3d 494, 500 n.2 (3d Cir. 1997).  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial.  Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment).  The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim.

7

Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will affect the outcome of the case under applicable law.  Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986).  Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Company of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).  Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson, 477 U.S. at 247-249.

### D.      Exhaustion of the *Bivens* and RFRA/RLUIPA Claims

### 1.      The Prison Litigation Reform Act

Defendants argue that some of Plaintiffs' *Bivens* and RLUIPA/RFRA claims should be dismissed for failure to comply with the exhaustion requirements of the Prison Litigation Reform Act[3], 42 U.S.C. § 1997e(a), which provides:

> no action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prisons, or other correctional facility until such administrative remedies as are available are exhausted.

Id.[4]

The requirement that an inmate exhaust administrative remedies applies to all inmate suits regarding prison life, including those that involve general circumstances as well as particular episodes.  Porter v. Nussle, 534 U.S. 516 (2002); Cutter v. Wilkinson, 544 U.S. 709,

---

[3]  Exhaustion of a claim under the Federal Tort Claims Act is a separate and distinct matter.  See 28 U.S.C. § 2675.

[4]  It is not a plaintiff's burden to affirmatively plead exhaustion.  Jones v. Bock, 549 U.S. 199, 217 (2007) ("...failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."); . Instead, the failure to exhaust must be asserted and proven by the defendants.  Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

723 n.12 (2005) (noting that the PLRA requires that "a prisoner may not sue under RLUIPA without first exhausting all available administrative remedies."); Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002) (for history of exhaustion requirement).  Administrative exhaustion must be completed prior to the filing of an action.  McCarthy v. Madigan, 503 U.S. 140, 144 (1992).  Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies.  Grimsley v. Rodriquez, 113 F.3d 1246 (Table), 1997 WL 2356136 (Unpublished Opinion) (10th Cir. May 8, 1997).[5]  The exhaustion requirement is not a technicality, rather it is federal law which federal district courts are required to follow.  Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").[6]

The PLRA also requires "proper exhaustion" meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of that grievance system.  Woodford v. Ngo, 548 U.S. 81, 87-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules ...").  Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective ... appeal."  Id. at 83; see also Spruill v. Gillis,  372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion) (" Based on our earlier discussion of the PLRA's legislative history, [...] Congress seems to have had three interrelated objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to

---

[5] Importantly, a plaintiff's failure to exhaust his administrative remedies does not deprive the district court of subject matter jurisdiction.  Nyhuis v. Reno, 204 F.3d 65, 69 n.4 (3d Cir. 2000) ("...[W]e agree with the clear majority of courts that §1997e(a) is *not* a jurisdictional requirement, such that failure to comply with the section would deprive federal courts of subject matter jurisdiction.").

[6] There is no "futility" exception to the administrative exhaustion requirement.  Banks v. Roberts, 2007 WL 3096585, at * 1 (3d Cir.) citing Nyhuis, 204 F.3d at 71 ("[Plaintiff's] argument fails under this Court's bright line rule that 'completely precludes a futility exception to the PLRA's mandatory exhaustion requirement.'").  See also Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Indeed, as we held in *Booth*, a prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.").

prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits.").

### 2.    The Administrative Process Available to Federal Inmates

So then, no analysis of exhaustion may be made absent an understanding of the administrative process available to state inmates. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. 199, 218 (2007).

The Bureau of Prisons has established a multi-tier system whereby a federal prisoner may seek formal review of any aspect of his imprisonment. 28 C.F.R. §§ 542.10, et seq. (1997). First, "an inmate shall ... present an  issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy." Second, if an inmate at an institution is unable to informally resolve his complaint, he may file "a formal written Administrative Remedy Request [to the Warden], on the appropriate form (BP-9), [within] 20 calendar days following the date on which the basis for the Request occurred." The warden has twenty (20) days in which to respond.  An inmate who is not satisfied with the warden's response may submit an appeal, on the appropriate form (BP-10), to the appropriate Regional Director within twenty (20) calendar days from the date the warden signed the response.  An inmate who is not satisfied with the Regional Director's response may submit an appeal, on the appropriate form (BP-11), to the General Counsel within thirty (30) calendar days from the date the Regional Director signed the response. The Regional Director has thirty (30) days and the General Counsel has forty (40) days to respond.  The administrative remedies process is not considered exhausted until the fourth step of the process is complete and the appeal is denied by the General Counsel.  Id.

### 3.      Exhaustion Applied

Defendants argue that all Plaintiffs have failed to exhaust their *Bivens* and

RLUIPA/RFRA claims with regard to the price of scented oils and that Plaintiff Campbell has

failed to exhaust his *Bivens* and RLUIPA/RFRA claims regarding the 2006 Eid celebration.

These arguments will be addressed separately.

#### a.      *Prayer oils*

Defendants argue that none of the Plaintiffs has filed any administrative remedies

complaining about the cost of the prayer oils.  In support of their argument, Defendants have

provided the declaration of Vanessa Herbin-Smith, the Supervisory Paralegal Specialist for the

Northeast Region of the Bureau of Prisons.  Ms. Herbin-Smith's declaration indicates that

neither Rogers, Singh nor Campbell has filed any administrative remedies as to the cost of

prayer oils.  Document # 53-1, ¶¶ 5-7.

Plaintiffs have not provided evidence to the contrary and, indeed, have not made any

argument as to this issue in their opposition brief, instead choosing to focus on the merits of the

issue.  In the face of a supported motion for summary judgment, Plaintiffs must provide contrary

evidence in order to save their case.  See Fed.R.Civ.P. 56(e) (providing that when a motion for

summary judgment is made and supported, "an adverse party may not rest upon the mere

allegations or denials of the adverse party's pleading, but the adverse party's response, by

affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is

a genuine issue for trial. If the adverse party does not so respond, summary judgment, if

appropriate, shall be entered against the adverse party.").

Accordingly, the motion for summary judgment should be granted in this regard and the

*Bivens* and RLUIPA/RFRA claims involving the sale or cost of prayer oils should be dismissed

from this action in accordance with the requirements of the PLRA.

#### b.      *all claims of Plaintiff Campbell*

Next, Defendants argue that Plaintiff Campbell has not exhausted his administrative

11

remedies as to any of the *Bivens* or RLUIPA/RFRA claims. The Declaration of Ms. Herbin-Smith indicates that Plaintiff Campbell has not filed a single administrative remedy as to any of the issues raised in this case. Id. Again, Plaintiffs have not provided evidence or argument to the contrary, as they must in order to survive the fully supported motion for summary judgment.

To the extent that the Amended Complaint alleges that "Plaintiffs and others, on behalf of the Members of the Sunni Community at FCI-McKean, has [sic] exhausted administrative remedies as required" (Document # 41, page 11), this allegation is factually and legally incorrect.

Generally, the Bureau of Prisons regulations provide that "an inmate may not submit a request or appeal on behalf of another inmate." 28 C.F.R. § 542.10(a). However, as Plaintiffs cite in their Amended Complaint, Program Statement 1330.13, Section Six provides for an exception in that "the president of a recognized inmate organization may submit a request on behalf of that organization regarding an issue that specifically affects that organization." However, Plaintiffs do not allege that either Singh or Rogers was the President of a recognized organization.[7] Therefore, no other inmate could have exhausted administrative remedies on

_____

[7]   As the undersigned concluded in Ellis, 06-305:

> "The terms "recognized" and "inmate organization" are addressed in Program Statement 5381.05. Document # 125-17, Declaration of Executive Assistant Monica Recktenwald, Exhibit 3, ¶ 2; Document # 125-19, Program Statement 5381.05 (establishing basic procedures concerning the establishment, regulation and operation of inmate organizations and providing a uniform system whereby all organizations will operate within a similar framework of administrative and financial management.). Although the Bureau of Prisons permits "inmate organizations for recreational, social, civic and benevolent purposes," religious groups are not included. Moreover, the Program Statement explains that to be a "recognized"organization, the inmate organization must request prior approval from the Warden. Id. The record evidence demonstrates that there were no "recognized inmate organizations" at FCI McKean during the relevant time frame. Document # 125-17, Recktenwald Declaration, Exhibit 3, ¶ 4."

Ellis v. United States, 2009 WL 440390, at * 7 n.5 (W.D.Pa. February 23, 2009). See also Clark v. Sherman, 2009 WL 57085 (W.D. Pa. Jan. 8, 2009). The same analysis applies here.

behalf of Campbell as no one was authorized to do so.  Williams v. Beard,  482 F.3d 637, 639 (3d Cir.2007) quoting Spruill, 372 F.3d at 231 ("'[P]rison grievance procedures supply the yardstick' for determining what steps are required for exhaustion.").

Accordingly, the motion for summary judgment should be granted in this regard and the *Bivens* and RLUIPA/RFRA claims of Plaintiff Campbell should be dismissed from this action in accordance with the requirements of the PLRA.


### E.      The RLUIPA/RFRA Claims[8]

#### 1.      RLUIPA

Under the Religious Land Use and Institutionalized Persons Act, "government" is defined as "a State, county, municipality, or other governmental entity created under the authority of a state," and "any branch, department, agency, instrumentality or official, thereof, and "any other person acting under color of State law." 42 U.S.C. 2000c5(4).  Accordingly, federal courts have held that RLUIPA "only applies to state and local governments, not a federal prison." Pineda-Morales v. DeRosa, 2005 WL 1607276, at *4 (E.D. N.J. 2005). See also Navajo Nation v. U.S. Forest Service, 535 F.3d 1058 (9th Cir. 2008).

Because Plaintiffs are federal inmates, the RLUIPA claims should be dismissed.

---

[8]      In 1993, the Religious Freedom Restoration Act was enacted by Congress.  A few years later, in City of Boerne v. Flores, the Supreme Court held the RFRA unconstitutional as to state and local governments.  521 U.S. 507 (1997).  However, RFRA claims against the federal government "remain viable." Jama v. Esmor Correctional Services, Inc., 577 F.3d 169, 172 n4 (3d Cir. Aug.12, 2009) citing Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006).  The Religious Land Use and Institutionalized Persons Act was enacted as a replacement to the RFRA in 2000, and the Third Circuit has held that the provisions of the RLUIPA are "nearly identical" to the provisions of the RFRA.  Norwood v. Strada, 249 Fed.Appx. 269, at *2 (3d Cir. 2007).

## 2.    RFRA

RFRA  provides, in relevant part, that no prison that receives federal funding shall impose a substantial burden on the religious exercise of a person confined to the prison even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest.  42 U.S.C. § 2000bb-1(b). Generally, the provisions of the statute "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."  Cutter, 544 U.S. at 721.

Under RFRA, the "government shall not substantially burden a person's exercise of religion."[9]  42 U.S.C. § 2000bb-1(a).  "The burden of proving the existence of a substantial interference with a religious exercise rests on the religious adherent."  Baranowski v. Hart, 486 F.3d 112, 124 (5th Cir. 2007). See also Washington v. Klem, 497 F.3d 272, 283 (3d Cir. 2007).

The United States Court of Appeals for the Third Circuit has held that a "substantial burden" lies where:

1)    a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR

2)    the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

Washington, 497 F.3d at 280 (capitalization in original) adopting the definition of "substantial burden" enunciated by the Fifth Circuit in Adkins v. Kaspar, 393 F.3d 559 (5th Cir. 2004).  See also Heleva v. Kramer, 330 Fed. Appx. 406, 409 (3d Cir. 2009).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the government to demonstrate that "application of the burden" to the plaintiff "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling

---

[9]  "Exercise of religion" is defined by the statute as including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5.

governmental interest." 42 U.S.C. § 2000bb-1(b).[10] "When considering the government's burden, we owe due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Smith v. Kyler, 295 Fed.Appx. 479, 484 (3d Cir. 2008) citing Cutter, 544 U.S. at 722.

Here, Plaintiffs allege that Defendants refused to provide Halal beef and attempted "to coerce and force Plaintiffs and others into rescheduling the Eid and into accepting food that is not require (sic) for the success (sic) completions of the Eid-ul-Adha."   Document # 41, page 14, ¶ 4.8.  In their Declarations, Plaintiffs Singh and Rogers explain that this day "is the holiest event in the Islamic faith" and consists of three components: "1) the community Salat (prayer), 2) the Khutab (sermon), and 3) the sacrifice or eating of camel, lamb, or beef."  Document # 56-1, Declaration of Plaintiff Rogers, page 3; Document # 56-2, Declaration of Plaintiff Singh, page 3.  Plaintiffs further explain that: "if anyone of those components that make up Eid-ul-Adha is missing then the Eid-ul-Adha is incomplete.  Therefore, once you miss the obligations for that event you also miss the blessings that come with performing those obligations which you can never again gain in life."  Id.

However, the denial of a single meal has been held to **not** constitute a  substantial burden on the exercise of one's religion.  Pratt v. Corrections Corp. of America, 267 Fed.Appx. 482, 483 (8th Cir. March 7, 2008) (RFRA claim fails "because he did not show that defendants placed a 'substantial burden' on his ability to practice his religion by failing to provide him with Halal meat" instead of a vegetarian diet).  See also Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 810-12 and n. 8 (8th Cir. 2008) (prison's meal plan regulations did not substantially burden Muslim

---

[10]  A sister circuit court has characterized these types of claims as consisting of four elements, with a shifting burden of proof: "Plaintiff has the burden of proving both that his religious exercise has been burdened, and that the burden is substantial.  The burden then shifts to the government to show both that the burden furthers a compelling governmental interest, and that the burden is the least restrictive means of achieving that compelling interest."  See Logan v. Lockett, 2009 WL 799749, at *3 (W.D. Pa. March 25, 2009) (M.J. Bissoon) and Sharp v. Johnson, 2008 WL 941686, at *21 (W.D. Pa.) (M.J. Hay), both quoting Spratt v. Rhode Island Dept. Of Corrections, 482 F.3d 33 (1st Cir. 2007).

inmate's free exercise rights where inmate had access to only vegetarian entrees, and some of those entrees he had to pay for himself); Abdul-Malik v. Goord, 1997 WL 83402, at *5-7 (S.D.N.Y. 1997) (holding that the failure to provide Muslim inmates with Halal meat several times per week did not substantially burden their exercise of religion under RFRA).

Thus, Plaintiffs have failed to establish a *prima facie* RFRA claim[11] regarding the denial of Halal beef for the observance of the January 2006 Eid-ul-Adha and summary judgment should be granted in favor of Defendants with regard to this claim.

### F.    The *Bivens* Claims under the First and Fifth Amendments[12]

#### 1.    *Respondeat Superior*

Defendants Sherman and Robare argue that they should be dismissed from this case because Plaintiffs have failed to allege their personal involvement and therefore have failed to state a claim against them.  The Court disagrees.

When a supervisory official is sued in a civil rights action, liability can only be imposed if that official played an "affirmative part" in the complained-of misconduct.  Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986).   Although a supervisor cannot encourage constitutional violations, a supervisor has "no affirmative constitutional duty to train, supervise or discipline so as to prevent such conduct."  Id. quoting Brown v. Grabowski, 922 F.2d 1097, 1120 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991).  The supervisor must be personally involved in the alleged misconduct.  Rode v. Dellarciprete, 845 F.2d 1958, 1207 (3d Cir. 1988).

---

[11]    Because Plaintiffs have not demonstrated a substantial burden on their "religious exercise," the burden of proof does not shift to Defendants.  Therefore, the Court need not review Defendants' arguments regarding whether a compelling governmental interest is being furthered by the least restrictive means.  Washington, 497 F.3d at 278, 283.

[12]  To the extent that Plaintiffs allege any *Bivens* claims against the United States, such claims should be dismissed based upon sovereign immunity.  See F.D.I.C. v. Meyer, 510 U.S. 471, 477-78 (1994); Johnstone v. United States, 980 F.Supp. 148, 151 (E.D. Pa. 1997) (explaining that *Bivens* actions "may only be maintained against federal officers; sovereign immunity bars such actions against the United States or agencies thereof.").

Section 1983 liability cannot be predicated solely on *respondeat superior*. Rizzo v. Goode, 423 U.S. 362 (1976); see also Monell v. Department of Social Services, 436 U.S. 658 (1978) (superiors of line officers who act in violation of constitutional rights may not be held liable on a theory of vicarious liability merely because the superior had a right to control the line officer's action); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293-1295 (3d Cir. 1997) (to hold police chief liable under § 1983 for violating female subordinate officer's rights, she was required to prove that he personally participated in violating the her rights, that he directed others to violate her rights, or that he had knowledge of and acquiesced in his subordinates' violations). If a grievance official's only involvement is investigating and/or ruling on an inmate's grievance after the incident giving rise to the grievance has already occurred, there is no personal involvement on the part of that official. Rode, 845 F.2d at 1208; Cooper v. Beard, 2006 WL 3208783 at * 14 (E.D.Pa. Nov. 2, 2006).

Here, Plaintiffs raise the following specific allegations against Defendants Sherman and Robare:

> Plaintiff and other leaders from the Sunni Muslim community was [sic] planning and discussion [sic] the 2006 Eid-ul-Adha celebration with Defendants, James F. Sherman, S.L. Robare,... since May 2005.... The reason for this intense and long planning and discussion was to prevent problems from occurring like there did [sic] for the 2005 Eid-ul-Adha. During the planning phase Defendants ordered the Plaintiff and others to submit an Inmate Request to Staff to the Religious Service concerning the Eid-ul-Adha for 2006.

> &ast;   &ast;   &ast;

> Defendants James F. Sherman, Edward Roberts, Jan C. Olowin, Brian Grimm, Gerald Desio and unknown others acted in concert with each other to arbitrary [sic] and capriciously deny and deprive Plaintiff of his religious feast....

Document #41, pages 12, 15.

Thus, Plaintiff claim that Defendants Sherman and Robare participated and/or had input into the discussions leading up to the decision to deny Halal meat for the 2006 Eid celebration. These allegations are sufficient to, at least, call into question the personal involvement of both Defendants Sherman and Robare in the central decision-making process at issue in this case. Additionally, Plaintiffs Rogers and Singh provide declarations that Sherman and Robare were

17

personally involved "in the planning, denial, deprivation, and rescheduling of the 2006 Eid-ul-Adha." Documents #56-1, 56-2. Because the evidence is conflicting, a genuine issue of material fact remains. Accordingly, Defendants' motion to dismiss Defendants Sherman and Robare from this case, based on Plaintiffs' failure to allege their personal involvement, should be denied.

### 2.____First Amendment - Free Exercise of Religion Claim

Despite their incarceration, prisoners have a First Amendment right to practice their religion. Bell v. Wolfish, 441 U.S. 520, 544 (1979). However, these constitutional rights are limited by the fact of incarceration as well as valid penological objectives. See O'Lone v. Shabazz, 482 U.S. 342, 348 (1987) (free exercise rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or maintain prison security"). The evaluation of penological objectives in this context is "committed to the considered judgment of prison administrators," and to ensure appropriate deference to those judgments, courts review challenged prison regulations under the overall reasonableness test of Turner v. Safley, 482 U.S. 78 (1987). O'Lone, 82 U.S. at 349 quoting Bell, 441 U.S. at 562.

The Turner v. Safley reasonableness analysis[13] focuses on four factors:

1.  whether there is a legitimate rational connection between the prison regulation and the governmental interest;

2.  whether the prisoners have alternative means of exercising the constitutional right at hand;

3.  the impact that accommodation of the constitutional right would have on other prisoners, guards, and prison resources in general; and

---

[13] The Turner analysis "... assumes as a predicate that the plaintiff inmate has demonstrated that a constitutionally protected interest is at stake." DeHart v. Horn, 227 F.3d 47, 51 (3d Cir. 2000). "The mere assertion of a religious belief [by a prisoner] does not automatically trigger First Amendment protections ... [O]nly those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." Id. quoting Africa v. Pennsylvania, 662 F.2d 1025, 1029-30 (3d Cir. 1981) cert. denied, 456 U.S. 908 (1982) ("A court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature...").

4.      the availability of alternatives to the regulation.

482 U.S. at 89-90, reaffirmed in Overton v. Bazzetta, 539 U.S. 126, 131 (2003).  See also Beard v. Banks, 548 U.S. 521, 535 (2006) (plurality opinion).  As the Third Circuit explained:

> The first two Turner factors focus on the prison's decision – to what extent is it justified by legitimate and neutral concerns and what options does it leave open to the inmate [...] The third and fourth factors, on the other hand, focus on the specific religious practice or expression at issue and the consequences of accommodating the inmate for guards, for other inmates, and for the allocation of prison resources.

DeHart v. Horn, 227 F.3d 47, 57 (3d Cir. 2000).  These four factors function as guidelines to be weighed in the overall determination of reasonableness  - they are not prongs of a four-part test in which each prong must be met.  See Waterman v. Farmer, 183 F.3d 208, 213 (3d Cir. 1999); Whitney v. Brown, 882 F.2d 1068, 1071 (6th Cir. 1989).  The Turner analysis is exceedingly fact-intensive.  See Wolf v. Ashcroft, 297 F.3d at 308 ("evaluations of prison restrictions under Turner require a contextual, record-sensitive analysis.").[14]  "Furthermore, the burden is not on the state to prove the validity of the challenged regulation, but instead is on the inmate to disprove it."  Williams v. Morton, 343 F.3d 212, 217 (3d Cir. 2003) citing Overton, 539 U.S. 126.

Defendants argue that Plaintiffs' First Amendment free exercise of religion claims should be dismissed because their alleged denial of the Halal meat for the Eid meal passes constitutional muster.  On the contrary, Defendants' presentation raises genuine issues of material fact that should preclude summary judgment.

Plaintiffs maintain that on the scheduled day for the Eid-ul-Adha celebration, "defendants refused to provide an appropriate religious dietary meal (Halal beef ...) as promised

---

[14]   See also Brothers v. Lawrence County Prison Board, 2008 WL 146828, at *5 (W.D.Pa Jan.14, 2008) (describing the Turner reasonableness test as "a multi-factored fact-intensive test" which does not lend itself to resolution on a motion to dismiss); Ford v. McGinnis, 352 F.3d 582, 596 (2nd Cir. 2003) (referring to Turner analysis as "fact – and context – specific."); Johnson v. Guiffere, 2007 WL 3046703, at *6 (N.D.N.Y., 2007)("Such an inquiry [under Turner] is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment.").

and attempted to coerce and force Plaintiffs and others into rescheduling the Eid and into accepting food that is not required for the success (sic) completions of the Eid-ul-Adha." Document # 41, Amended Complaint, page 14.   See also Document # 56, Opposition Brief, page 8. In response, Defendants, through the Declaration of Defendant Olowin, swear that the Muslim inmates "were never denied the opportunity to have a ceremonial meal on the Eid-ul-Adha in 2006," but instead they  "chose not to celebrate this feast because we, the Chaplains ..., reasonably decided that our budget constrained us from purchasing traditional or cultural food items for religious groups during the 2006 fiscal year, including Halal meat for the Eid." Document # 53-7, page 8, 20.

This is the first of several factual disputes which should preclude summary judgment on Plaintiffs' free exercise claim under the First Amendment. Whether Defendants denied Plaintiffs the Halal meat after first promising it to them (as Plaintiffs argue) or Plaintiffs chose not to observe Eid after Defendants decided not to purchase the Halal meat (as Defendants contend) is a material issue of fact, the resolution of which will affect the outcome of this case.  See Anderson v. Liberty Lobby, 477 U.S. at 248 (credibility determinations are jury functions and are not appropriate for a judge to make in ruling on a motion for summary judgment).

Similarly, the disputed factual issue revolving around whether the Eid-ul-Adha celebration can be observed without Halal meat also precludes a summary judgment determination.

Defendant Olowin declares that Eid can be commemorated by a day of  "work proscription, prayer, and **may** include a ceremonial meal."  Document # 53-7, Olowin Declaration, page 6 (emphasis in original).   In a later clarifying Declaration, Defendant Olowin states that "halal meats such as beef, camel, ram or lamb are *not* required for the Eid-ul-Adha ceremonial meal.  Although Halal lamb or other appropriately slaughtered animal meat is a traditional food for the Eid-ul-Adha, it is not a mandatory requirement for the ceremonial feast."  Document # 53-19, page 5 (emphasis in original).  Similarly, Defendant Edward Roberts, the Religious Services Administrator for the Bureau of Prisons, explains that the "religious requirements for this feast include a special prayer [...] and a type of sermon.  In the

20

Bureau of Prisons, this feast is commemorated by a day of work proscription and prayer, and **may** include a ceremonial meal."  Document # 53-16, Roberts Declaration, page 3 (emphasis in original).

Defendants go on to explain that:

> The Muslim ceremonial meals are required to consist of Halal foods.  Halal, which means lawful and includes all foods that are not unlawful. [...] The guidance provided by the Bureau of Prisons lists the following foods as Halal: milk from cows, sheep, camels and goats; honey, fish; plants which are not intoxicants; fruits and vegetables, fresh, frozen or dried; legumes and nuts; and various grains.

Document # 53-7, Olowin Declaration, page 6.  See also Document # 53-17, Declaration of

Ibraham Aziz, Religious Services Administrator at FCI-Fort Dix.[15]

On the other hand, Plaintiffs Singh and Rogers swear that the Eid celebration consists of

three components: "1) the community Salat (prayer), 2) the Khutab (sermon), and 3) the

---

[15]   In his Declaration drafted for Civil Action No. 06-305E, Ellis, et al v. United States, et al, and resubmitted in the present case, Aziz explains:

> The celebration of Eid-ul-Adha commemorates the sacrifice of Ibrahim (Abraham) [...] In the Bureau of Prisons, this day is commemorated by a day of work proscription and prayer, and may include a ceremonial meal.  Although most Bureau of Prisons institutions celebrate the Muslim annual faith meal on Eid Al Fitr marking the completion of the fasting month of Ramadan.(sic)  All faith groups in the Bureau of Prisons are offered the privilege of an annual meal. The ceremonial meal if celebrated at Eid-ul-Adha may be celebrated with any food items that do not violate Islamic teachings.  Per Program Statement 5360.09, Religious Beliefs, the ceremonial meal is to be selected from foods that are provided from the master menu.  All Fish is Halal and is provided on the master menu.  The selection of fish and the absence of the lamb at Eid-Ul-Adha (sic) did not violate the celebration of the holiday meal.  While lamb, beef, camel or any other slaughtered item is traditional, they are not religiously required.  I have been advised that the Plaintiffs in the above-referenced case (06-305) are asserting they belong to the Traditional Orthodox Sunni doctrine of the Four School of Jurisprudence which requires the serving of Halal lamb at this feast.  I also belong to these groups.  Our Sunni schools of thought do not place any such requirement which specifies any particular food or menu.  It is customary in Muslim settings to have a festive meal which may be made up of any food items that do not violate Islamic dietary teachings.

Document # 53-17, page 3.

sacrifice or eating of camel, lamb, or beef." Document # 56-1, Declaration of Plaintiff Rogers,

page 3; Document # 56-2, Declaration of Plaintiff Singh, page 3. Plaintiffs further explain that:

> "it is a mandatory and a central requirement to follow the Sunnah or
> Traditions/Customs of Prophet Muhammad, sallallahu alayhi wa sallam, and this
> includes the eating of Halal meat (camel, lamb, or beef) for Eid. The eating of
> any of those meats during Eid is to symbolize the required sacrifice for those who
> cannot afford or are unable to offer a sacrifice to the Eid. This act
> commemorates the sacrifice made by Abraham and his son. Moreover, the eating
> of those meats on the day of the Eid is not simply a celebration dinner, but rather,
> is similar to the required foods of Passover for the Jewish inmates, the
> ceremonial tea for the Chinese inmates, and the wine and bread of communion
> for the Catholic inmates. Just as the Catholic inmates drink wine and eat bread
> during communion to commemorate the sacrifice made by Jesus the Sunni
> Muslims eat Halal meats (camel, beef, or lamb) during the Eid to commemorate
> the sacrifice made by Abraham and his son."

Id.  Plaintiffs also note that the Bureau of Prisons and FCI-McKean have historically provided

Halal lamb or meat during the observance of Eid. Document # 56, page 5.

In addition to their own declarations, Plaintiffs provide documents from the Internet that

illustrate the central importance of the Halal meat to the observance of the Eid celebration.

Document #56-3, page 27(from www.islamallday.com, "One should eat the meat of the

sacrifice, give it to relations and friends, (to non-Muslims also) and to the poor in charity."); id.

at page 30 (from www.islamallday.com, "The following ... things have been prescribed to be

done on Eid-ul-Adha: ... To distribute the meat of the sacrifice among the poor, friends, relatives

and neighbors and also to cook and eat the meat of sacrifice."); id. at page 33 (from

www.infoplease.com, "The festival is celebrated by sacrificing a lamb or other animal by

distributing the meat to relatives, friends, and the poor. The sacrifice symbolizes obedience to

Allah and its distribution to others is an expression of generosity, one of the five pillars of

Islam."); id. at pages 35-6 (from www.wikipedia.org, after the sacrifice of a suitable animal,

"according to the Quran, the meat is divided into three shares, one share for the poor, one share

for the relatives and neighbors, and the last to keep to oneself. A large portion of the meat

MUST be given towards the poor and hungry people so they can all join in the feast. ... The

remainder is cooked for the family celebration meal in which relatives and friends are invited to

share. The regular charitable practices of the Muslim community are demonstrated during Eid-

ul-Adha by the concerted effort to see that no impoverished Muslim is left without sacrificial

food during these days.  Eid-ul-Adha is a concrete affirmation of what the Muslim community ethic means in practice. [...] Distributing meat among people is considered an essential part of the festival during this period..."); and id. at page 39 (from www.britannica.com, "During the festival, families that can afford to sacrifice a ritually acceptable animal (sheep, goat, camel, or cow) and then divide the flesh equally among themselves, the poor, and friends and neighbors. [...] This festival commemorates the ransom with a ram of the biblical patriarch Ibrahim's son Ismael.").

So then, whether the Eid-ul-Adha celebration can be observed with Halal foods (as Defendants maintain) or must be observed with Halal meat (as Plaintiffs contend) is a matter of factual dispute between the parties.  This factual dispute represents an ecclesiastical question upon which this Court may not express an opinion.  See Ford, 352 F.3d at 590 quoting Hernandez v. Comm'r. of Internal Revenue, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigant's interpretations of those creeds."); Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 714 (1981) ("The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task ... However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question").

Besides the obvious factual dispute, the resolution of this question also directly impacts the Court's analysis as to whether the government's expressed "legitimate penological interest" is rationally related to the denial of the Halal meat for the Eid-ul-Adha observance under the first prong of the Turner reasonableness test.

### The First Turner Factor

The first Turner factor[16] examines the relationship between the challenged policy and the

---

[16]   "Although the factors are intended to serve as guides to a single reasonableness standard, 'the first factor looms especially large' because it 'tends to encompass the remaining

(continued...)

articulated penological interest.  "A prison regulation fails this prong if it promotes an interest

that is illegitimate or not neutral, or ... bears no valid, rational connection to the asserted

interest."  Fraise v. Terhune, 283 F.3d 506, 516 (3d Cir. 2002).  "Turner requires prison

authorities to show more than a formalistic logical connection between a regulation and a

penological objective."  Beard, 548 U.S. at 535.

 Here, Defendants argue that "the Chaplains at FCI McKean reasonably decided not to

purchase **traditional or cultural** food items for **ceremonial** meals for any religious group

during the 2006 fiscal year."  Document # 53, page 22.[17]  Defendants explain that Bureau of

Prisons policy provides that "food items related to **religious purposes** may be procured by the

Chaplain through Food Service in the minimum quantities necessary for the fulfillment of the

**ritual observance**."  Document # 53-13, Declaration of Food Services Administrator Defendant

Gerald Desio, page 3.  Defendant Olowin further explains:

> Chaplains may use a small portion of the annual Chaplaincy Services budget to
> acquire **traditional/ritual** food items to supplement the mainline foods served
> for the **ceremonial** meal. [...] Accordingly, the applicable procedure
> demonstrates a distinction between **ceremonial** meals - which are provided by
> Food Services and paid for through that department's budget – and
> **traditional/ritual** food items – which are provided to supplement the mainline
> foods and paid for through Religious Services' budget. These **traditional/ritual**
> food items are not entrees provided to each inmate in a religious group; rather
> they are of such limited quantities as to provide merely a taste for each inmate."

Document # 53-19, Supplemental Declaration of Olowin, page 6.  See also Document # 53-8,

Bureau of Prisons Program Statement on Religious Beliefs and Practices (P5360.09), pages 20-

22 ("The chaplain may arrange for inmate religious groups to have one appropriate **ceremonial**

**or commemorative** meal each year for their members ...  Chaplains may use a small portion of

the annual Chaplaincy Services budget to acquire **traditional/ritual** foods to supplement the

_____

[16](...continued)

factors, and some of its criteria are apparently necessary conditions.'" Waterman v. Farmer, 183
F.3d 208, 213-14 (3d Cir. 1999) quoting Amatel v. Reno, 156 F.3d 192, 196 (D.C. Cir. 1998).

 [17]  Generally, budgetary constraints may constitute a valid penological interest and
restricting religious-based meals has been held to be rationally related to that interest.  See
Williams v. Morton, 343 F.3d 212, 217-18 (3d Cir. 2003); Fraise, 283 F.3d at 517-18; DeHart,
227 F.3d at 53.

mainline foods served for the **ceremonial** meal.").[18]

Defendants explain that "faced with the need to reduce expenses and based on the recommendation of Chaplaincy Services, the Chaplains at FCI McKean reasonably decided not to purchase **traditional or cultural food** items for **ceremonial** meals for any religious group during the 2006 fiscal year." Document # 53, page 22.   In support of their contention in this regard, Defendants have provided evidence that the budget of the Religious Services Department[19] was decreased by fifteen percent for fiscal year 2005 and remained nearly the same for fiscal year 2006.  Document # 53-7, Declaration of Olowin, page 5.

Defendants maintain that the Chaplains' decision was made at least, in part, "based on the recommendation of Chaplaincy Services."  Document # 53, page 22.  The Chaplaincy Services recommendation reads:

> While Bureau of Prisons policy gives institutions the option to use a small portion of the chaplaincy budget **to acquire traditional/ritual foods to supplement the ceremonial meal** ... This practice is not recommended in this era of fiscal restraint.  The local decision not to serve **ritual/traditional** foods for ceremonial meals reflects sound financial management.

Document # 53-10, "Update" from Chaplaincy Services dated August 2004, page 2.

Importantly, Defendants' professed legitimate penological interest of limiting expenditures in

---

[18]   The Bureau of Prisons Program Statement also provides that each individual institution will develop an Institutional Supplement for operating religious programs and activities, which "must include ... procedures for ... **ceremonial** meals and whether appropriated funds will be used to supplement the **ceremonial** meals with **traditional/ritual** foods." Document # 53-8, pages 20-22.  The McKean Supplement, MCK 5360.09, provides:

> **Liturgical/ceremonia**l meals: the observance of once a year **liturgical/ceremonial** meal by a religious group in the institution will be permitted. <u>The food will be made available through food service's budget, not religious services</u>. ... The menu of a **ceremonial** meal will be taken from the Food Service institutional master menu.

Document # 53-9, page 8.

[19]   The Chaplaincy and the Religious Services Department appear to be the same department.

compliance with the Chaplaincy's Recommendation is not borne out by the record before this Court.  The Chaplaincy Recommendation on which Defendants rely recommends curtailing purchases of both **traditional and ritual** foods.  Defendant Olowin's own declaration illustrates that FCI McKean did not follow the National Chaplaincy's recommendation. Document #53-7, page 5 (Religious Services Department "did not purchase **traditional or cultural** food items for **ceremonial** meals for any religious group during the 2006 fiscal year.").   Instead, FCI McKean purchased **ritual** items, but not **traditional or cultural** food items.

It is worth noting at this point that in their evidentiary documents, Defendants use the terms **"ceremonial," "commemorative," "traditional," "ritual," "liturgical," and "cultural"** as guideposts for their decision-making process, yet these terms are not defined and are used inconsistently throughout the record.[20]   For example, the Bureau of Prisons Program Statement equates the words "**traditional" and "ritual"** and takes them together indicating that such food items will be purchased from the Chaplaincy's budget, while Defendant Olowin contrasts the term **"traditional"** from "**ritual,"** and instead equates the word "**traditional" with "cultural"** in his Declarations.  See Document # 53-7, page 5 ("In contrast to **traditional or cultural** food items, such **ritual** food items are required for specific faiths.").  However, Olowin himself also uses the terms **traditional and ritual** together in a Memo dated November 4, 2005 rejecting an inmate's request for Halal lamb for the 2006 Eid observance.  See Document # 53-12, page 2.

By way of further example, the Bureau of Prisons Program Statement refers to "**ceremonial or commemorative**" meals and limits the observance of such meals to once per year per religious group.  See Document # 53-8, Bureau of Prisons Program Statement on Religious Beliefs and Practices, (P5360.09), pages 20-22.  Yet the corresponding McKean Supplement limits the observance of "**liturgical/ceremonial**" meals to once per year per religious group.  See Document # 53-9, McKean Supplement MCK 5360.09, page 8.  The terms

---

[20]  In this Court's opinion, serving a ham on Easter Sunday may be **traditional** for Catholics, and may be considered **cultural** by some, but that Easter ham is not **ritual, ceremonial,  commemorative, or liturgical**.  Wine and communion wafers are **liturgical** (in the truest sense of the word), and possibly **ritual** (depending on the definition), but may or may not necessarily be considered **commemorative, ceremonial**, **cultural**, or even **traditional**.

**ceremonial and commemorative** are drastically different than the terms **liturgical and ceremonial**. The term **liturgical** is generally defined as "relating to a Eucharistic rite" or "relating to a rite or body of rites prescribed for public worship" which is certainly much narrower than any denotation of the term **ceremonial**.[21]

In his Supplemental Declaration, Olowin attempts to clarify some of this confusion and disorder by noting a difference between 1) **traditional or cultural** food items, and 2) **ritual** food items that are required for the proper practice of one's religion. Document # 53-19, page 6. Further, "examples of **traditional or cultural** food items include buffalo for American Indian inmates, Halal lamb for Muslim inmates, and mooncakes for Chinese Confucianist or Buddhist inmates. Examples of **ritual** food items include Communion for Catholic inmates and Matza and grape juice for Jewish inmates." Id. In further support of his sworn statements, Defendant Olowin provides the purchase orders for all food items purchased by the Religious Services Department for the fiscal year 2006, explaining that these documents "reflect purchases of **ritual food** items that are required by a religion for the proper practice of an inmate's religion, such as wine for Catholics and Matzos for the Jewish faith." Document # 53-7, page 5. However, despite Defendant Olowin's specific averment that the purchase orders represent purchases of "**ritual** food items ... such as wine for Catholics," the purchase orders themselves belie his sworn assertions as there is not a single purchase order for wine or communion wafers in the record for the entire fiscal year. See Document # 53-11, Purchase Orders, pages 2- 14. [22]

---

[21] The term **liturgical** generally connotes Eucharist, or communion. It strains credulity to believe that Catholic inmates at FCI McKean are receiving only one Eucharistic (or "**liturgical**") meal per year. The McKean Supplement stipulates that expenditures for **liturgical/ceremonial** meals will come from Food Service budget, not the budget of Religious Services, yet Defendant Olowin states that he considers wine for Catholics as **ritual** and such wine is purchased from the budget of Religious Services (even though the purchase orders for fiscal year 2006 contradict Olowin's Declarations in this regard). See footnote 22.

[22] The fiscal year 2006 purchase orders reflect purchases of:

>        - Grape juice from Kedem Food Products, International (a provider of Kosher
>                                                                  (continued...)

Additionally, despite his affidavit attempting to distinguish **traditional/cultural** food items from **ritual** food items, in a Memo dated November 4, 2005, Olowin himself rejects a request for Halal lamb for the Eid celebration because "in this era of cost cutbacks and financial

---

[22](...continued)
foods) on October 5, 2005 in the amount of $310.00

- Dates from BrokenStraw for Ramadan on October 5, 2005 in the amount of $170.25

- Honey bears for Teas from Thorne's Bilow on October 1, 2005 in the amount of $17.94

- Kinck-nick, flat cedar and bear barry from Crazy Crow Trading Post (a supplier of Native American Indian goods) on October 19, 2005 in the amount of $ 114.95

- Ceremonial Tea for the Chinese (from Long Life) on November 16, 2005 in the amount of $ 84.00

- Dates for Ramadan from Brokenstraw on October 17, 2005 in the amount of $113.50

- Hamantash cookies for Purim from ALEPH on March 3, 2006 in the amount of $7.50

- Matches, fish, batteries, duster, horseradish, chicken boulin (sic) from TOPS on April 8, 2006 in the amount of $48.50

- Seder plates, matza, macaroons from ALEPH on March 15, 2006 in the amount of $180.00

- Ceremonial Tea from Long Life on April 6, 2006 in the amount of $ 83.00

- Kosher grape juice from Kedem Food Products on April 24, 2006 in the amount of $ 300.00

- Ceremonial Tea from Long Life on August 24, 2006 in the amount of $80.00

- Dates for Ramadan from Crescent on August 16, 2006 in the amount of $432.00

Document # 53-11.

restraint it is not necessary nor is it fiscally prudent to provide **traditional or ritual** foods for a ceremonial meal." Document # 53-12, page 2.  Olowin's affidavit saying that ritual foods are purchased, while traditional/cultural are not is in direct contradiction to this Memo. Document # 53-19.

Defendants' failure to define these terms in their evidentiary documents, or to at least use the terms in a consistent manner, is the death knell to their motion for summary judgment. Without clear parameters as to what types of items will be purchased by Religious Services, it is impossible for this Court to determine whether the professed budgetary constraints of the Religious Services Department are rationally related to the denial of Halal meat for the Eid observance.

So then, there is at least one material issue of disputed fact as to whether Defendants expressed "legitimate penological interest" of following the Chaplaincy's Recommendation and limiting expenditures from the decreased budget of the Religious Services' Department is rationally related to the denial of the Halal meat for the January 2006 Eid-ul-Adha observance. Defendants own evidentiary records reflect that the Chaplaincy's Recommendation was not fully followed, and so this Court finds that the expressed "legitimate penological interest" is not "rationally related" to the denial of the Halal meat.  And, because of Defendants imprecise use of language, it is impossible to determine whether the denial of the meat is rationally related to the decreased Religious Service's budget.

Accordingly, this Court expresses no conclusion as to whether the first Turner factor weighs in favor of Plaintiffs or Defendants.  Nonetheless, although there are material issues of fact as to the first Turner factor, the remaining factors must be addressed herein.  While "the first factor is 'foremost in the sense that a rational connection is a threshold requirement - if the connection is arbitrary or irrational, the regulation fails, irrespective of whether the other factors tilt in its favor.  But, ... we do not view it as subsuming the rest of the inquiry."  Sutton, 323 F.3d at 253 quoting Wolf v. Reno, 297 F.3d 305, 310 (3d Cir. 2002).  See also Warren v. Pennsylvania, 316 Fed. Appx. 109, 115 (3d Cir. 2008) ("Although the district court summarized the Turner precepts and weighed in on the first factor of the analysis, it did not undertake the

test of overall reasonableness.").

*The Second Turner Factor*

The second Turner factor "requires a court to assess whether inmates retain alternative means of exercising the circumscribed right." Fraise, 283 F.3d at 518 quoting Turner, 482 U.S. at 90.  The analysis focuses specifically on whether the inmate "has alternative means of practicing his [] religion generally, not whether an inmate has alternative means of engaging in the *particular practice* in question." DeHart, 227 F.3d at 55 (emphasis added).  "If the policy does afford the inmate alterative means of expressing his religious beliefs, that fact tends to support the conclusion that the regulation at issue is reasonable." Id. at 57.  When weighing this factor, "we must, of course, focus on the beliefs of the inmate asserting the claim.  It is obviously impossible to determine whether a regulation leaves an inmate with alternative ways of practicing the inmate's religion without identifying the religion's practices." Sutton, at *12 quoting Fraise, 283 F.3d at 518.  However, this factor "is not intended to require courts to determine whether an inmate's sincerely held religious belief is sufficiently orthodox to deserve recognition." Id. quoting DeHart, 227 F.3d at 55.[23]

Defendants argue that Plaintiffs had the means to observe Eid-ul-Adha by not working and with the opportunity to pray, but also acknowledge that this day is one of two "required" holy days per year for Muslims.  See Documents # 53-7, and 53-19.  Plaintiffs refute this by swearing that the Eid observance is not complete without all three parts - the prayer, the sermon, and the eating or sacrificing of Halal meat.  See Document # 56-1, and 56-2.

Therefore, there is a material issue as to the second Turner factor.

---

[23] See also DeHart, 227 F.3d at 56 n.5 ("We stress that the second factor of the Turner test is directed solely to evaluating the interest of the inmate in having his requested accommodated.  Our holding with respect to the impropriety of disregarding a sincerely held belief solely because it is not an Orthodox one relates specifically to the issue of whether alternative means of expression are available to the inmate.").

*The Third Turner Factor*

Under Turner's third factor, this Court must examine the impact of an accommodation on other inmates, prison staff, and the available resources within the prison, but "should defer to prison officials when the accommodation 'will have a significant ripple effect on fellow inmates or on prison staff ....'" Fraise, 283 F.3d at 520 quoting Turner, 482 U.S. at 90.

Defendants argue that accommodating Plaintiffs by providing the Halal meat would have required the Religious Services Department to provide traditional or cultural foods to each of the other approximately twenty religious groups at FCI McKean.  Document # 53.

It is not clear from the record before this Court that such an accommodation would have been a further strain on the Religious Service's budget as there is a material issue of disputed fact as to whether the Halal meat is required for the observance.  If the Halal meat is not required for the religious observance as Defendants maintain, the purchase of this meat from the Religious Services budget would have opened the door for other non-required food items to be purchased for other religious groups.  However, if the Halal meat is required for the observance of Eid as Plaintiffs contend, this purchase would not have opened the door for further purchases for other religious groups, because, as Defendants explain, the Religious Services Department was already providing the food items "required for the practice of one's religion."

Therefore, there is a material issue of fact as to the third Turner factor.

*The Fourth Turner Factor*

The fourth Turner factor requires this Court to assess whether there are alternatives to the regulation that would impose only "*de minimus* cost to valid penological interests." Turner, 482 U.S. at 91.  "The absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id.  However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id.

Plaintiffs have not specifically identified any alternative, and therefore, the fourth Turner

31

factor weighs in favor of Defendants.

*The Overall Reasonableness Determination*

The numerous disputed factual issues preclude a determination as to the overall reasonableness of the challenged action.  Accordingly, Defendants motion for summary judgment should be denied as to the First Amendment claim.


**_____3.        Fifth Amendment - Equal Protection Claim**

Next, Plaintiffs claim that the denial of Halal meat for the Eid celebration violated their equal protection rights. The Equal Protection Clause provides that no state shall "deny to any person ... the equal protection of its laws."  U.S. Const. Amend. XIV, §1.  All persons "similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).

The Turner v. Safley reasonableness analysis applies to the equal protection claim, just as it applies to the First Amendment claim.  See DeHart, 227 F.3d at 61 ("Turner is equally applicable [to the equal protection claim], and the appropriate analysis for this claim is the same as that for [the] Free Exercise claim.").  However, as a threshold matter, in order to establish an equal protection violation, a plaintiff must "...demonstrate that [he has] been treated differently by a state actor than others who are similarly situated simply because [he] belongs to a particular protected class."  Keevan v. Smith, 100 F.3d 644, 648 (8th Cir. 1996).

Here, Plaintiffs' equal protection claim is based solely on their treatment as Sunni Muslims as compared to other religiously active inmates at FCI-McKean.  Plaintiffs allege that Buddhists, Catholics and Jews are treated better than Muslims.  Specifically, Plaintiffs swear that the Jewish inmates receive several religious ceremonial meals per year.  Document # 56-1, page 4.  Plaintiffs also allege that Defendants "purchased and provided Kosher items and meats for the Jewish inmates for their Passover and their other ceremonial occasions" and Defendants "also purchased and provided special food and items for other faith groups and secular holidays,

such as New Years, Easter Sunday, the Fourth of July, and Labor Day, Thanksgiving, and Christmas." Document # 41, page 15.

Defendants have provided evidence that Chaplains Grimm and Olowin decided "not purchase any traditional or cultural foods for ceremonial meals for any religious group during the 2006 fiscal year." Document # 53-7, Olowin Declaration, page 5. Defendants also claim that the purchase orders for fiscal year 2006 "reflect purchases of ritual food items that are required by a religion for the proper practice of an inmate's religion, such as ... Matza for the Jewish faith." Document #53-7, pages 5-6.

In response, Plaintiffs provide the following evidence by sworn affidavit:  1) that eating Halal meat is "a central requirement" during Eid-ul-Adha as it "commemorate[s] the sacrifice made by Abraham and his son," and 2) that Kosher meat meals and matzah were provided to Jewish inmates during Passover. Document # 56-1, page 2.  In other words, Plaintiffs claim that eating Halal meat in observance of Eid-ul-Adha is similar to the required foods of Passover for the Jewish inmates.

Therefore, at the very least, a genuine issue of material fact exists as to the threshold inquiry of whether these similarly situated inmates were treated differently.  This precludes summary judgment, so that the Turner analysis need not be reached here. See DeHart, 227 F.3d at 61.

Defendants' motion for summary judgment should be denied as to this claim.


### 4.____Fifth Amendment - Due Process Claim

Plaintiffs aver, generally, that their due process rights under the Fifth Amendment were violated by Defendants.  Plaintiffs' allegations in this regard are barely more than a mere mention and Plaintiffs do not articulate whether the due process challenge is procedural or substantive in nature.

The Due Process Clause, guaranteed through the Fourteenth Amendment of the United States Constitution, provides that no state shall "deprive any person of life, liberty, or property,

without due process of law." U.S. Const. Amends. V; XIV.  The Due Process Clause was promulgated to secure the individual from the arbitrary exercise of the powers of government. The "procedural" aspect of the Due Process Clause requires the government to follow appropriate procedures to promote fairness in governmental decisions; while the "substantive" aspect of the Clause bars certain government actions regardless of the fairness of the procedures used to implement them so as to prevent governmental power from being used for purposes of oppression.  Daniels v. Williams, 474 U.S. 327, 329-33 (1986).

### a.        Substantive due process

The constitutional right to "substantive due process" protects individuals against arbitrary governmental action, regardless of the fairness of the procedures used to implement them.  Foucha v. Louisiana, 504 U.S. 71, 80 (1990).  See also Collins v. Harker Heights, 503 U.S. 115, 126 (1992) (the Due Process Clause was intended to prevent government officials from abusing power, or employing it as an instrument of oppression); Wolff v. McDonnell, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government.").

The Supreme Court has declined to set forth a precise rule that defines the scope of impermissible "arbitrary" conduct for purposes of applying the substantive component of the Due Process Clause.  County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (clarifying that governmental conduct does not violate a person's substantive due process rights unless it amounts to an abuse of official power that "shocks the conscience.").  A substantive due process claim based upon alleged arbitrary and capricious action is not easily mounted, because the relevant level of arbitrariness required in order to find a substantive due process violation involves not merely action that is unreasonable, but rather, something more egregious, which the Third Circuit has termed "conscience shocking."  Hunterson v. DiSabato, 308 F.3d 236, 246-47 (3d Cir. 2002). This Circuit has made clear that "only the most egregious conduct will be considered arbitrary in the constitutional sense." Id. at 247-48.

Nothing in the complaint rises to the level of conscience shocking behavior that would

support a substantive due process claim.  Accordingly, to the extent that Plaintiffs are attempting to state claims of substantive due process, summary judgment should be entered in favor of Defendants with regard to such claims.

### b.        Procedural due process

The procedural aspect of the Due Process Clause guarantees the availability of certain procedural mechanisms, typically the right to notice and a hearing, before the government can deprive an individual of a liberty or property interest.  To establish a procedural due process violation, a person must demonstrate that he has been deprived of a constitutionally-protected property or liberty interest.  <u>Daniels</u>, 474 U.S. at 339.  If a person does not have a constitutionally-protected interest, he is not entitled to the procedural protections afforded by the Due Process Clause.[24]

A constitutionally-protected interest may arise either from the Due Process Clause itself, or from a statute, rule, or regulation.  <u>Hewitt v. Helms</u>, 459 U.S. 460, 466 (1983).[25]  Plaintiff

---

[24]  If a liberty interest is found, the next step in the due process inquiry is to determine what process is due.  "Due process ... is not a technical conception with a fixed content unrelated to time, place and circumstances."  <u>Gilbert v. Homar</u>, 520 U.S. 924, 930 (1997).  "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."  <u>Morrissey v. Brewer</u>, 408 U.S. 471,  481 (1972).  At a minimum, due process requires notice and the opportunity to be heard.  <u>Paul v. Davis</u>, 424 U.S. 693, 724 (1976) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.").

[25]  See <u>Washington v. Glucksberg</u>, 521 U.S. 702 , 720 (1997) ("The [Due Process] Clause [...] provides heightened protection against government interference with certain fundamental rights and liberty interests. [In] a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the liberty specially protected by the Due Process Clause includes the rights to marry, <u>Loving v. Virginia</u>, 388 U.S. 1 (1967); to have children, <u>Skinner v. Oklahoma ex rel. Williamson</u>, 316 U.S. 535 (1942); to direct the education and upbringing of one's children, <u>Meyer v. Nebraska</u>, 262 U.S. 390 (1923); <u>Pierce v. Society of Sisters</u>, 268 U.S. 510 (1925); to marital privacy, <u>Griswold v. Connecticut</u>, 381 U.S. 479 (1965); to use contraception, <u>ibid.</u>; <u>Eisenstadt v. Baird</u>, 405 U.S. 438 (1972); to bodily integrity, <u>Rochin v. California</u>, 342 U.S. 165 (1952), and to abortion, <u>[Planned Parenthood of Southeastern Pennsylvania v.] Casey</u>, [505 U.S. 833 (1992)].").

does not have either a property or liberty interest in receiving a Halal meat for the Eid-ul-Adha meal.  See Russell v. Wilkinson, 79 Fed.Appx. 175 (6th Cir. 2003) (holding that the denial of kosher meals did not involve a property or liberty interest for purposes of due process analysis). Therefore, Plaintiffs cannot support claims based upon a violation of their procedural due process rights, and summary judgment should be entered in favor of Defendants with regard to such claims.

### 5.    Qualified Immunity

Alternatively, Defendants contend that they are entitled to qualified immunity as to the *Bivens* and RLUIPA/RFRA claims because  it was objectively reasonable for the Individual Defendants to believe that they did not violate any clearly established statutory or constitutional rights by making the decisions at issue in this case.   Because this Court has recommended the dismissal of the statutory claims under RLUIPA/RFRA  on other grounds, the analysis will focus solely on the First Amendment and equal protection claims of  Plaintiffs Rogers and Singh.

The doctrine of qualified immunity insulates government officials from liability for damages insofar as their conduct does not violate clearly established rights.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  An officer performing his discretionary functions is "shielded from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Curley v. Klem, 278 F.3d 271, 277 (3d Cir. 2002).  "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful."  Hope v. Pelzer, 530 U.S. 730, 739  (2002).[26]

---

[26]  In other words, "[w]hen an officer's actions give rise to a §1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as shield from suit.  The primary purpose of affording public officials qualified immunity, thus insulating them from suit, is to

(continued...)

The analytical framework that district courts have traditionally employed in determining whether the defense of qualified immunity applied was set forth by the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001).  The Third Circuit summarized that framework as follows:

> The [Supreme] Court explained that a qualified immunity analysis must begin with this threshold question: do the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right?  Saucier, 121 S.Ct. at 2156.  If the plaintiff fails to allege the violation of a constitutional right, no further inquiry is necessary.  If, however, the alleged facts show that there was a constitutional violation, then the next step is to ask whether the right was clearly established.  See id.  In other words, a court must consider whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Id.  This inquiry, the Court noted, must be undertaken in light of the specific context of the case, not as a broad general proposition.  Id.  If a court concludes that an officer's conduct did violate a clearly established constitutional right, then it must deny him the protection afforded by qualified immunity.  See id. at 2156-57.

Curley, 278 F.3d at 277.  See also Hope, 536 U.S. 730; Doe v. Delie, 257, F.3d 309 (3d Cir. 2001).

However, the rigid two-step inquiry set forth in Saucier has recently been relaxed by the Supreme Court in Pearson v. Callahan, 555 U.S. ___, 129 S.Ct. 808 (Jan. 21, 2009).  See also Bumgarner v. Hart, 2009 WL 567227 (3d Cir. March 6, 2009).  As the Supreme Court explained: "[b]ecause the two-step Saucier procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case."  Pearson, 555 U.S. at ___, 129 S.Ct. at 821.

Another district court within this Circuit summarized the current state of the Saucier framework in the post-Pearson era:

---

[26](...continued)
protect them from undue interference with their duties and from potentially disabling threats of liability.  The privilege of qualified immunity, however, can be overcome when state officials violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Wright v. City of Philadelphia, 409 F.3d 595, 599-600 (3d Cir. 2005) (internal citations omitted), declined to follow on other grounds, Kossler v. Crisanti, 564 F.3d 181, 193 (3d Cir. Apr. 21, 2009).

> By noting that in many instances a court need not reach whether a constitutional violation is alleged to determine if qualified immunity is appropriate, the Court stated that the first prong "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." In addition, "[a]lthough the first prong of the *Saucier* procedure is intended to further the development of constitutional precedent," the first prong "create[s] a risk of bad decisionmaking," specifically in those instances where a court decides a rather nuanced constitutional claim early on in litigation where the factual basis for the claims have not been fully developed through discovery.  Thus, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

DeLauri v. New Jersey Div. of State Police, 2009 WL 222983, at *5 (D.N.J., Jan. 27, 2009),

quoting Pearson, ___ U.S. at ___, 129 S.Ct. at 818-20.  See also Jarovits v. Monroe County

Children and Youth Services, 2009 WL 3004044, at *3 (3d Cir. Sep.21, 2009) (proceeding

directly to the second step of the Saucier analysis); Newland v. Reehorst, 2009 WL 1298414, at

*2 (3d Cir. May 12, 2009) (same).

     Although the record is replete with disputed issues of fact which limit a determination as

to the first step under Saucier (i.e., whether the Defendants' conduct violated Plaintiffs'

constitutional rights), in the spirit of Pearson and its progeny, this Court may proceed to the

second step of the Saucier analysis - whether those constitutional rights were "clearly

established."

     "The relevant, dispositive inquiry in determining whether a right is clearly established is

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

he confronted."  Saucier, 533 U.S. at 202.  The Supreme Court has observed:

> for a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the length of pre-existing law the unlawfulness must be apparent.

Hope, 536 U.S. at 739.

     In this case, the legal precedent regarding a prisoner's First Amendment right to the free

exercise of religion was clearly established at the time of the Defendants' alleged actions in

January of 2006.  See Cruz v. Beto, 405 U.S. 319 (1972); Bell, 441 U.S. 520 (1979); O'Lone,

38

482 U.S. 342 (1987); Turner,482 U.S. 78 (1987).  Additionally, the legal precedent regarding Plaintiffs' right to equal protection under the Fifth Amendment were clearly established at the time of the Defendants' alleged actions.  See City of Cleburne, 473 U.S. at 439 (1985)(Equal Protection Clause provides that all persons "similarly situated should be treated alike"); Plyler v. Doe, 457 U.S. 202 (1982) (same).  Thus, a reasonable government officer would be on notice that the conduct alleged here was unlawful.

Accordingly, Defendants are not entitled to qualified immunity and the motion for summary judgment should be denied in this regard.

### G.      Claims of All Plaintiffs under Federal Tort Claims Act.

#### 1.      Individual Defendants

The Federal Tort Claims Act ("FTCA") grants jurisdiction to the federal courts to hear suits against the United States Government for torts committed by its employees while in the scope of their employment.  See 28 U.S.C. § 2675(a).  The FTCA sets forth the government's consent to be sued for the negligent conduct of its employees "in the same manner and to the same extent as a private individual under like circumstances." Howell v. United States, 932 F.2d 915, 917 (11th Cir.1991) (citations omitted). The FTCA allows federal inmates to sue the United States for injuries sustained while incarcerated.  28 U.S.C. § 2674.

All actions brought pursuant to the FTCA must be brought against the United States of America and not in the name of the allegedly negligent agency, entity or employee.  28 U.S.C. §§ 2671-2680; 28 U.S.C. § 1346(b).   The only proper party in an FTCA action is the United States of America.  To the extent that Plaintiffs allege an FTCA claim against the individual Defendants, such claim should be dismissed.

#### 2.      United States

The FTCA does not create a substantive cause of action against the United States, but provides a mechanism by which a plaintiff may bring a state law tort action against the federal

government in federal court.  Hence, in a FTCA action, the district court applies the law of the state in which the act occurred.  <u>See</u> 28 U.S.C. § 1346(b); <u>Castillo v. U.S.</u>, 2002 WL 1752235, at *3 (7th Cir.2002).  The United States may only be held liable under the FTCA if a private person would be liable under the tort law of the state where the conduct at issue occurred.  <u>See</u> 28 U.S.C. § 1346(b)(1); <u>Williams</u>, 242 F.3d at 175.  The FTCA's limited waiver of sovereign immunity extends no further than the limits of private tort liability under state law, and a claim based on federal constitutional law may not be involved under the FTCA.  <u>Washington v. Drug Enforcement Administration</u>, 183 F.3d 868, 873 (8th Cir. 1999).

In their Amended Complaint, Plaintiffs specifically allege that the United States should be liable under the FTCA for "the intentional gross negligence, unlawful and malicious deprivation of Plaintiffs' religious exercise for the sole purpose of discriminating against Plaintiffs, to impose a substantial burden on Plaintiff's religious exercise, and cause them harm that constituted a derelict of duty, which also from negligence or wrongful acts or omissions by federal employees...."  Document # 41, pages 18-19.

To the extent that Plaintiffs are alleging an intentional tort, there is no FTCA claim.  28 U.S.C. § 2680(h).   To the extent that Plaintiffs are alleging a negligence claim, such should be dismissed because Plaintiffs have not alleged any physical injuries as required by the FTCA.  28 U.S.C. § 1346(b) (2) ("No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States ... for mental or emotional injury suffered while in custody without a prior showing of physical injury.").

Accordingly, the FTCA claims of all Plaintiffs should be dismissed and the United States of America should be terminated as a Defendant to this action.


III.    CONNCLUSION_____

For the foregoing reasons, it is respectfully recommended that the motion to dismiss or, alternatively, for summary judgment filed by Defendants [Document # 52] be:

40

- granted as to the *Bivens* and RFRA/RLUIPA claims of all Plaintiffs regarding prayer oils due to their failure to exhaust in accord with the PLRA;

- granted as to all the *Bivens* and RFRA/RLUIPA claims relating to the Eid meal in January of 2006 by Plaintiff Campbell as he has failed to exhaust in accord with the PLRA;

- granted as to the RLUIPA claims of all Plaintiffs;

- granted as to the RFRA claims of all Plaintiffs;

- denied as to the *respondeat superior* argument as to Defendants Sherman and Robare;

- denied as to the First Amendment free exercise claim;

- denied as to the Fifth Amendment equal protection claim;

- granted as to the substantive due process claim under the Fifth Amendment;

- granted as to the procedural due process claim under the Fifth Amendment;

- denied as to the qualified immunity defense of all individual Defendants;

- granted as to the dismissal of the FTCA claims against the individual Defendants; and

- granted as to the FTCA claim against the United States.


It is further recommended that the Clerk of Courts be directed to terminated Plaintiff Campbell from this action due to his failure to exhaust his *Bivens* and RLUIPA/ RFRA claims and because the FTCA claims are without merit.

It is further recommended that the Clerk of Courts should also be directed to terminate the United States of America as a party to this action.

The retaliation claims of Plaintiffs Singh and Rogers remain pending as Defendants have not moved for summary judgment on those claims.

A Case Management Order will be issued separately.

In accordance with Fed.R.Civ.P. 72, the parties are allowed fourteen (14) days from the date of service to file written objections to this Report and Recommendation.  Any party

opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  No extensions of time will be granted.  Failure to file timely objections may constitute a waiver of appellate rights.  See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).




                                        S/Susan Paradise Baxter
                                        SUSAN PARADISE BAXTER
                                        UNITED STATES MAGISTRATE JUDGE


Dated: February 9, 2010